**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

SPRINT COMMUNICATIONS, L.P.,

        Plaintiff,

    v.

AMHERST TELEPHONE COMPANY, *et al.*,

        Defendants.

Case No. 3:14-cv-00464-wmc

**MEMORANDUM OF TDS COMPANIES
IN SUPPORT OF MOTION TO DISMISS COMPLAINT**

Defendants Amelia Telephone Corporation; Arvig Telephone Co.; Camden Telephone Company, Inc.; Communications Corporation of Southern Indiana; Mid-Plains Telephone, LLC; Mid-State Telephone Company, Inc.; Midway Telephone Company, LLC; Shiawassee Telephone Co.; Southeast Telephone Company of Wisconsin, LLC; TDS Telecom Service Corporation; The State Long Distance Telephone Company, LLC; Tipton Telephone Co., Inc.; U.S. Link, Inc.; and Wolverine Telephone Co. (the "TDS Companies"), by their undersigned counsel, respectfully submit this Memorandum in support of their motion to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief can be granted.

**I.     INTRODUCTION**

This action is one of over 30 filed by Sprint Communications Company L.P. ("Sprint") since early May 2014 in federal courts across the country.[1] Each complaint alleges essentially the

---

[1]     These actions, as well as a series of similar, but separate, actions filed by MCI Communications Services Inc. and Verizon Select Services Inc., are the subject of a Motion to Transfer currently pending before the Judicial Panel on Multidistrict Litigation. *See In re IntraMTA Switched Access Charges Litigation*, MDL No. 2587.

same facts: Sprint, a long distance carrier, routed wireless calls to and from local exchange carriers ("LECs"), including TDS, over switched access (long distance) trunks pursuant to switched access service arrangements Sprint purchased from the LECs' federal and state tariffs. Having paid the LECs' billed switched access charges for years without dispute, Sprint now seeks a refund on the ground that some of the traffic it routed over the long distance trunks allegedly should not have been subject to switched access charges, but should have been billed at a lower "local" rate.[2]

Sprint is not entitled to a refund as a matter of law. Charges under tariffs are determined by the service purchased from the tariff, not the type of traffic for which the customer uses the service. By ordering switched access trunks from the defendant LECs and routing its traffic over those trunks, Sprint undertook to pay the switched access rates established by the filed tariffs, whether the routed traffic was long distance or local. Although Sprint's claim is based on its interpretation of an eighteen-year-old FCC order, Sprint has never challenged the validity of the LECs' switched access tariffs, and neither the FCC nor a state commission has ever invalidated those tariffs. Accordingly, Sprint's claims are barred by the filed rate doctrine. Moreover, Sprint has purchased and paid for the LECs' switched access services for nearly two decades without raising the dispute it now asserts. By failing to follow the tariffs' dispute resolution procedures, Sprint has waived its challenge to the switched access bills Sprint has already paid. Sprint's claim also is barred by the voluntary payment doctrine.

---

[2]     Sprint also seeks a declaratory ruling that certain traffic is not subject to access charges going forward.

## II.    BACKGROUND

Sprint is a wireline long distance "interexchange" telecommunications carrier ("IXC") that acts as an intermediary between LECs for the transmission of "wireline" traffic, and between wireless carriers and LECs for the transmission of wireless telephone traffic—traffic that either originates with, or terminates to, a wireless ("CMRS") end user. Complaint ¶¶ 1–3.[3] Calls between a wireless end user and a wireline end user within a single "Major Trading Area"—a wireless license area that can include more than one traditional local exchange area and can even cross state lines—are known as "intraMTA" calls. Complaint ¶¶ 1, 6.

The defendants are LECs—local exchange carriers that own the wireline facilities that connect customers' premises to the nationwide telecommunications network.[4] Complaint ¶ 3. Sprint routes its interexchange traffic, including the alleged intraMTA calls at issue, between wireless carriers and the defendant LECs using long distance wireline access facilities known as "Feature Group D" trunks. Complaint ¶ 46. The decision to use access trunks to carry intraMTA traffic is made by Sprint, not the LECs. Sprint admits that it purchased FGD trunks, and that it routed intraMTA traffic over those trunks. *Id*. Sprint does not (and cannot) allege that it ever sought any other arrangement for delivery of intraMTA traffic, so it was Sprint's choice to use the Feature Group D trunks, which it ordered from TDS under the terms of the TDS companies' federal and state access tariffs.[5] *See, e.g.,* Minnesota Independent Intrastate Access Tariff Minn.

---

[3]     Sprint Communications Company L.P.—the plaintiff in this action—is a different entity from Sprint Spectrum L.P., a wireless carrier. The Complaint admits that plaintiff is an interexchange carrier. Complaint ¶ 3.

[4]     Although all of the TDS companies are headquartered in Wisconsin (so venue is proper here), they provide telephone service in a variety of states. Sprint alleges that one or more of the TDS companies billed it switched access charges in Illinois, Indiana, Michigan, Minnesota, Virginia, and Wisconsin.

[5]     TDS's tariffs, available at http://www.tdstelecom.com/customerservice/tariffsearch.aspx, on file with appropriate regulatory agencies, or at http://www.telview.com/TariffLibrary.aspx?,

P.U.C.-Original ("MIAA Tariff"), § 5 (ordering options for switched access service), § 5.1.1 (ordering conditions for switched access service), § 6.2 (description of switched access services, including Feature Group D);[6] National Exchange Carrier Association, Inc. Tariff F.C.C.-No. 5 ("NECA Tariff"), § 5 (access ordering, generally), § 5.2.1 (ordering conditions for switched access service), § 6.8 (description of access services, including Feature Group D);[7] Wisconsin State Telephone Association Intrastate Access Charge Tariff Wis. P.S.C.-No.1 ("WSTA Tariff"), § 5 (access ordering, generally), § 5.2.1 (ordering conditions for switched access service), § 6.8 (description of access services, including Feature Group D).[8]

TDS's tariffs provide that all traffic routed over TDS's switched access trunks will be charged the access rates set forth in the tariffs. *See, e.g.,* John Staurulakis, Inc. Tariff FCC-No. 1 ("JSI Tariff"), § 6.1.3 (establishing rates for switched access services using Feature Group D trunks),[9] NECA Tariff, § 6.4.1 (establishing rates for switched access services using Feature Group D trunks); WSTA Tariff, § 6.4.1 (establishing rates for switched access services using

---

are public documents on file with the appropriate regulatory agencies, and may be considered on a motion to dismiss. *See Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("The district court may take judicial notice of public records and may thus consider them on a motion to dismiss"). *See also Global Crossing Telecomms., Inc. v. 3L Commc'ns Missouri, LLC,* 2013 WL 3893321, at *3 (E.D. Mo. July 26, 2013) ("Because Section 203(a) of the Communications Act requires every common carrier … to file with the FCC tariffs showing all charges, classifications, practices, and applicable regulations, [the carrier's] customers are charged with notice of Tariff F.C.C. No. 1, and its provisions").

[6]     Arvig Telephone Company and Mid-State Telephone Company are issuing carriers of the MIAA Tariff.

[7]     Communication Corporation of Southern Indiana is an issuing carrier of the NECA Tariff with respect to its interstate switched access services. Amelia Telephone Company, Communications Corporation of Indiana, Communication Corporation of Southern Indiana, and Wolverine Telephone Company have concurred with or otherwise adopted by reference the applicable sections of the NECA Tariff with respect to their intrastate switched access services.

[8]     Mid-Plains Telephone Company concurs with the applicable sections of the WSTA Tariff.

[9]     The MIAA Tariff refers to the applicable section of the JSI Tariff for intrastate services.

Feature Group D trunks); *see also* MIAA Tariff, § 6.2.3 (describing Feature Group D trunks as switched access trunks); NECA Tariff, § 6.8.1 (describing Feature Group D trunks as switched access trunks); WSTA Tariff, § 6.8 (describing Feature Group D trunks as switched access trunks). Sprint purchased access services from TDS's federal and state switched access tariffs, Complaint ¶¶ 54, 55, and alleges that it routed both intraMTA and non-intraMTA wireless traffic (in addition to wireline traffic) over TDS's Feature Group D access trunks. *See* Complaint ¶ 46. Sprint alleges that TDS billed Sprint switched access charges for all of the traffic Sprint routed over TDS's access trunks, including the alleged intraMTA traffic at issue. Complaint ¶¶ 18-31. Sprint paid those charges, without dispute. *See* Complaint ¶ 1. Although Sprint alleges that the FCC stated in its 1996 *Local Competition Order*[10] and its 2011 *Connect America Fund Order*[11] that intraMTA calls are "local" and not subject to access charges (Complaint ¶¶ 6, 7, 47-52), Sprint does not—and cannot—allege that the FCC has ever invalidated, or ordered TDS to amend, TDS's federal or state tariffs.

## III.   ARGUMENT

### A.   The FCC's "IntraMTA Rule" Does Not Apply to Traffic Carried by IXCs

The principal theory underlying all of Sprint's claims is that the FCC's 1996 *Local Competition Order* adopted a rule supposedly prohibiting the billing of access charges for origination or termination of intraMTA calls. Complaint ¶¶ 47-50. Sprint further alleges that its interpretation of this rule has been upheld by various federal courts, Complaint ¶ 51, and by a 2011 FCC

---

[10]    *In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996*, 11 FCC Rcd 15499 (1996) (subsequent history omitted).

[11]    *In re Connect America Fund*, 26 FCC Rcd 17663 (2011) (subsequent history omitted).

clarification. Complaint ¶ 52. Although Sprint alleges various legal theories of liability, it admits

they all are premised on this same FCC rule. Complaint ¶ 53.

### 1.   The FCC's 1996 and 2011 Orders Only Apply to Traffic Exchange Between Wireless Carriers and Local Telephone Companies

Sprint's interpretation of the FCC rules is wrong. The FCC does not permit an IXC to use

a LEC's switched access service without paying for it, even when some of the calls being carried

may be intraMTA wireless traffic. Rather, the FCC rule only prohibits LECs and wireless

carriers from charging *each other* for the origination or termination of intraMTA calls. Sprint is

not a wireless carrier, and therefore does not benefit from the rule. *See, e.g., Local Competition

Order* ¶ 1041 ("[R]eciprocal compensation obligations … apply to all local traffic transmitted

between LECs and CMRS providers"); *id.* ¶ 1045 ("CMRS providers … will receive reciprocal

compensation"). In fact, the rules governing intraMTA traffic—including the specific local

compensation rules Sprint relies on (*see* Complaint ¶ 47)—are contained in Part 51.701 of the

FCC's regulations, and address how CMRS providers and LECs should compensate each other.[12]

By contrast, the rules governing the exchange of traffic between an IXC (like Sprint) and

a LEC (like TDS) are contained in an entirely separate part (Part 69) of the FCC's regulations,

say nothing about intraMTA traffic, and provide no exclusion to IXCs from the application of

tariffed access charges for the tariffed access services they purchase merely because they use

---

[12]     Although the FCC revised Part 51.701 of its rules in late 2011 as part of its *Connect America Order* to address new intercarrier service and compensation arrangements between telecommunications carriers that the FCC prospectively authorized in that order under Section 251(b)(5) of the 1996 Act, those rules did not revise (nor could they revise) the statutory requirement that a carrier must request such service and compensation arrangements pursuant to Sections 251 and 252 of the Communications Act, which Sprint has not done.

those services to route intraMTA traffic.[13] The *Local Competition Order* itself made this distinction, recognizing that traffic between LECs and CMRS providers but carried by an IXC was subject to switched access charges. *See, e.g., Local Competition Order* ¶ 1043 ("Under our existing practice, most traffic between LECs and CMRS providers is not subject to interstate access charges *unless it is carried by an IXC….*") (emphasis added). In short, the FCC has not disturbed its Part 69 rules applicable to service arrangements between a LEC and an IXC.

Moreover, the *Local Competition Order* made clear that the FCC's intraMTA rules do not apply to tariffed access arrangements. Paragraph 1043 expressly preserved access arrangements that existed at the time the 1996 Act went into effect:

> Based on our authority under section 251(g) [of the 1996 Act] to preserve the current interstate access charge regime, we conclude that the new transport and termination rules [*i.e.,* the rules Sprint invokes] should be applied to LECs and CMRS providers so that CMRS providers continue not to pay interstate access charges for traffic that currently is not subject to such charges, *and are assessed such charges for traffic that is currently subject to interstate access charges.*

11 FCC Rcd 15499 ¶ 1043 (emphasis added).

The *Connect America Order*, which the FCC issued 15 years after the *Local Competition Order*, does not provide otherwise. The FCC stated only that a LEC may not bill *a CMRS carrier* access charges if an intraMTA call is routed through an IXC. *See* 26 FCC Rcd 17663 ¶ 1007 n.2132 (LECs have "extended reciprocal compensation arrangements with CMRS providers to intraMTA traffic without regard to whether a call is routed through interexchange carriers"). But nowhere did the FCC say that the LEC may not impose tariffed access charges *on the IXC* for

---

[13]     *See* 47 C.F.R. §69.5(b) ("Carrier's carrier charges shall be computed and assessed upon all interexchange carriers that use local exchange switching facilities for the provision of interstate or foreign telecommunications services."); 47 C.F.R. §69.2(b) ("Access service includes services and facilities provided for the origination or termination of any interstate or foreign telecommunication.").

those calls where the IXC routes the traffic over tariffed FGD services rather than requesting a separate service arrangement with reciprocal compensation rates. And the FCC took pains to emphasize that it was "clarifying," not modifying, the 1996 intraMTA rule, so it cannot have intended to impose a new prohibition that did not exist under the original rule.

### 2.   The Eighth Circuit's *INS* Decision Does Not Control.

Sprint relies heavily on the Eighth Circuit's ruling in *Iowa Network Servs., Inc. v. Qwest Corp.*, 466 F.3d 1091, 1096 (8th Cir. 2006) ("*INS*"), but that case did not address the issue that is presented here. *INS* involved two intermediary carriers, neither of which was acting as an IXC. One of the carriers (INS, a collection of Iowa LECs) asserted that it was entitled to access charges for intraMTA traffic pursuant to its federal and state tariffs. The other carrier, Qwest, refused to pay access charges, claiming that the appropriate compensation mechanism was reciprocal compensation in negotiated (or arbitrated) interconnection agreements under Sections 251 and 252 of the Communications Act, 47 U.S.C. §§ 251, 252. *See Iowa Network Serv's., Inc. v. Qwest Corp.*, 385 F.Supp.2d 850, 866 (S.D. Iowa 2005), *affirmed by* 466 F.3d 1091. Qwest asked the Iowa Utilities Board to decide the issue; the Board determined that the traffic in question was local and ordered the parties to negotiate an interconnection agreement under Section 252(b). *Id.*

Affirming the district court, the Eighth Circuit held that the state Board's determination that Qwest need not pay access charges on intraMTA traffic was consistent with federal law, and that the Board was authorized to decide the issue because the FCC's reciprocal compensation rules "do not directly address the intermediary carrier compensation to be paid[.]" 466 F.3d at 1096. In so holding, the Eighth Circuit agreed with the district court's conclusion that "the [1996] Act and the FCC's interpretive and implementing decisions have eliminated access

charges, or tariffs such as INS seeks to impose, for local traffic." *Id.* at 1095. It thus upheld the district court's (and the Board's) determination that "reciprocal compensation agreements should control and … the parties should negotiate or arbitrate—not unilaterally file tariffs." *Id.* at 1096.

Both the district court and the Eighth Circuit emphasized their reliance on an earlier ruling by the Iowa Utility Board ("IUB") that had resolved closely-related disputes between the same parties within Iowa. *In re Exch. of Transit Traffic*, SPU-00-7, Proposed Decision & Order, 2001 WL 36521831 (Iowa U.B. Nov. 26, 2001) ("*IUB Proposed Order*"), *aff'd*, 2002 WL 535299 (Iowa U.B. Mar. 18, 2002) ("*IUB Final Order*"), *followed by* 466 F.3d at 1097; *see also* 385 F.Supp.2d at 863 (noting "pivotal role" played by the IUB and finding its determinations "relevant and potentially dispositive"). In particular, the IUB had ordered the parties to negotiate an ICA that would provide reciprocal compensation arrangements for intraMTA traffic—exactly what Sprint has *not* done here. The Eighth Circuit deferred to the Iowa commission's determination because it was "not contrary" to federal law. *See* 466 F.3d at 1097. The Eighth Circuit repeatedly emphasized it was deferring to the IUB's analysis for this party-specific, Iowa-specific dispute. *Id.* at 1094-98.

Moreover, the IUB and the courts found that Qwest, the intermediate carrier in *INS*, was *not* acting as an IXC. *See* 385 F. Supp. 2d at 871-876, 893. This is crucial, because the IUB recognized an "IXC exception" to the intraMTA rule, *id.* at 871 ("[t]he regulatory classification of Qwest is, however, pertinent as there exists within the reciprocal compensation rules an exception for IXCs"), meaning that IXCs may be subject to access charges when carrying intraMTA traffic. *Id.* at 893.

Finally, the relief Sprint seeks here—refunds for previously paid access charges—was specifically rejected by the IUB. *IUB Final Order* at 14-18. Instead, the IUB and the federal

courts held that Qwest, INS, and the CMRS carriers had to negotiate ICAs to address compensation for intraMTA calls going forward. *See* 466 F.3d at 1096 (when dealing with intraMTA traffic, "reciprocal compensation agreements control" and the parties should negotiate or arbitrate). Sprint ignores this ruling, undoubtedly because Sprint has never asked TDS to enter into an ICA that governs any intraMTA traffic Sprint exchanges with TDS.

*Alma Commc'ns Co. v. Mo. Pub. Serv. Comm'n*, 490 F.3d 619 (8th Cir. 2007), cited at Complaint ¶ 51, is no more helpful to Sprint, because it did not involve an IXC's obligation to pay access charges. Rather, it concerned the relationship between Alma, a local exchange carrier, and T-Mobile, a wireless carrier, and the application of an interconnection agreement approved by a state commission. The court was reviewing a state commission determination in a Section 252 arbitration. The case did not involve charges to an IXC, nor a claim for refunds. *See Alma*, 490 F.3d at 620. As a result, it does not support Sprint's claim that a LEC cannot bill an IXC switched access rates for the switched access services the IXC has purchased from a filed tariff.

### B.    Plaintiff's Claim Is Barred by the Filed Rate Doctrine.

Sprint's effort to evade its obligation to pay for the access services it has purchased under TDS's longstanding federal and state filed tariffs must fail because the filed rate doctrine prohibits any deviation from the terms of such tariffs. Having already paid for, and received, the switched access services it purchased, Sprint now claims it should get a refund, alleging that TDS's filed tariffs are "*ultra vires*" and "unenforceable" (*see* Complaint ¶¶ 66, 75, 80, 85, 90, 95, 100) because the FCC allegedly concluded that intraMTA traffic is "local" and generally not subject to access charges. Although, as explained above, Sprint's reading of the FCC orders is wrong, the filed rate doctrine provides an independent reason to dismiss its claims.

The filed rate, or filed tariff, doctrine "forbids a regulated entity from charging a rate for its services other than the rate on file with the appropriate regulatory authority." *Crumley v. Time Warner Cable, Inc.,* 556 F.3d 879 (8th Cir. 2009). "[T]he rate of the carrier duly filed is the only lawful charge," and "[d]eviation from it is not permitted upon any pretext." *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 127 (1990) (quoting *Louisville & Nashville R.R. Co. v. Maxwell,* 237 U.S. 94, 97 (1915)). *See also Firstcom, Inc. v. Qwest Corp.,* 555 F.3d 669, 679 (8th Cir. 2009) (filed rate doctrine also applies to state tariffs). The 1934 Act is explicit: "Every common carrier … shall … file with the [FCC] and keep open for public inspection schedules showing all charges for itself and its connecting carriers … and showing the classifications, practices and regulations affecting such charges." 47 U.S.C. § 203(a). Furthermore, "[n]o carrier … shall engage or participate in any such [interstate wire or radio] communication unless schedules have been filed and published in accordance with the provisions of this Act and with the regulations made thereunder, and no carrier shall … charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect[.]" *Id.* § 203(c).[14]

Sprint admits that it purchased services from TDS's federal and state switched access tariffs (Complaint ¶¶ 54, 55); that it routed its alleged intraMTA traffic over TDS's switched access trunks, primarily Feature Group D (Complaint ¶ 46); that TDS billed Sprint switched access

---

[14]     The governing statutes of the states in which TDS does business are, in all material respects, the same. *See, e.g.,* Wis. Stat. Ann. § 196.191(7) ("Except as provided in sub. (6), no telecommunications utility or alternative telecommunications utility may charge, demand, collect, or receive more or less compensation for any service for which a tariff is filed under this section than is specified in the tariff, as may at the time be in force, or demand, collect, or receive any rate, toll, or charge for such service not specified in the tariff.").

charges for Sprint's use of those trunks as set out in TDS's federal and state tariffs (Complaint

¶ 59); and that Sprint paid the billed access charges (*see* Complaint ¶ 1). Tellingly, Sprint does

*not* allege that TDS's tariffs were not properly filed with the appropriate agencies, or that the

FCC has found TDS's filed tariffs to be unjust or unreasonable.[15] Indeed, Sprint does not even

allege that it ever filed a complaint with the FCC against these tariffs during the 18 years since

the *Local Competition Order* was adopted. To the contrary, Sprint affirmatively alleges that the

TDS Companies have filed tariffs and that those tariffs are valid and binding. (Complaint ¶¶ 69,

74, 79, 84, 89, 94, 99.)

　　　TDS's switched access tariffs have been on file for decades, have never been invalidated,

and remain in effect with the "force of law." *MCI Telecommunications Corp. v. Garden State

Inv. Corp.,* 981 F.2d 385, 387 (8th Cir.1992). In fact, TDS is *required* to charge Sprint the rates

set out in TDS's filed tariffs. "Under the Interstate Commerce Act [the predecessor to the 1934

Act], the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted

upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the

carrier must abide by it, unless it is found by the Commission to be unreasonable…. This rule is

undeniably strict and it obviously may work hardship in some cases, but it embodies the policy

which has been adopted by Congress in the regulation of interstate commerce in order to prevent

unjust discrimination." *American Telephone & Telegraph Company v. Central Office Telephone,

Inc.*, 524 U.S. 214, 222-23 (1998) (quoting *Louisville & Nashville R. Co. v. Maxwell,* 237 U.S.

---

[15]　　　If the FCC had so found, there would be no reason for Sprint to ask this Court—and about 30 other federal courts—to consider the issue.

94, 97 (1915)).[16] Thus, Sprint's claim that it is entitled to a refund after paying the tariffed rate must be rejected as a matter of law.

### C. Sprint Failed To Dispute the Billed Access Charges in Accordance with Applicable Tariffs and Voluntarily Paid Them.

Not only did Sprint fail to seek relief from the FCC, but Sprint failed even to dispute the access charge bills it received from TDS in accordance with the dispute resolution provisions of the applicable tariffs. Instead, Sprint voluntarily paid its bills, in full knowledge of the FCC orders it now relies on to allege that the tariffs have been unenforceable all along.

Section 2.4.1(D)(1) of the NECA Tariff provides that "A good faith dispute requires the customer to provide a written claim to the Telephone Company." The claim "must identify in detail the basis for the dispute, and if the customer withholds the disputed amounts, it must identify the account number under which the bill has been rendered, the date of the bill, and the specific items on the bill being disputed to permit the Telephone Company to investigate the merits of the dispute." *See also* JSI Tariff, § 2.4.1(D)(1) (same as NECA Tariff, § 2.4.1(D)(1)).[17] Sprint does not allege that it ever disputed any of the switched access bills it received from TDS on the ground that some of the traffic billed at access rates was intraMTA traffic that should instead be billed at local rates. Having failed to avail itself of the dispute provisions in the

---

[16]     Although the filed tariff doctrine can "work hardship in some cases," this is not one of them. Sprint chose to purchase switched access services from TDS and chose to route intraMTA traffic over long distance switched access trunks, thereby incurring switched access charges under the filed tariffs. Sprint paid the charges without complaint until shortly before it filed these actions in May 2014, when it apparently decided that the FCC's 18-year-old *Local Competition Order*—which Sprint plainly knew about all along (it is the foundational FCC order under the 1996 Telecommunications Act)—entitles Sprint to a refund of access charges it voluntarily incurred and paid. Moreover, with respect to any alleged intraMTA traffic that originated with TDS's landline end-users and was transported by Sprint, Sprint presumably charged those end-users (who would have presubscribed to Sprint as their long distance carrier) Sprint's rates for long distance service.

[17]     The MIIA Tariff refers to the applicable section of the JSI Tariff.

governing tariffs, Sprint is barred from seeking a refund of the access charges it paid. *See, e.g.,*
*MCI WorldCom, Inc. v. Teletower, Inc.*, 2002 WL 378424 (S.D.N.Y. Mar. 11, 2002) (court
entered judgment in favor of carrier where tariff required customer to dispute bills within six
months or waive the dispute, and there was no allegation that customer had disputed the bills);
*accord, MFS Intern., Inc.v. International Telcom Ltd.*, 50 F.Supp.2d 517, 523 n.14 (E.D. Va.
1999) (customer could not prosecute counterclaim against carrier because tariff provision
required customer to dispute bills within 30 days or waive dispute; *MCI Telecomm. Corp. v.*
*Best Tel. Co.*, 898 F. Supp. 868, 874-75 (S.D. Fla. 1994) (noting that invoice under a tariff is
deemed correct and binding if not disputed).

Sprint's failure to dispute TDS's bills is more than mere oversight. Sprint is charged not
only with knowledge of the law (including the provisions of the FCC's orders), but also the
terms of the tariffs under which it purchases services. *See Global Crossing Telecommunications,*
*Inc. v. 3L Commc'ns Missouri, LLC,* 2013 WL 3893321 (E.D. Mo. July 26, 2013) ("Because
Section 203(a) of the Communications Act requires every common carrier … to file with the
FCC tariffs showing all charges, classifications, practices, and applicable regulations, [the
carrier's] customers are charged with notice of Tariff F.C.C. No. 1, and its provisions"). Accord-
ingly, the billing dispute provisions of TDS's tariffs are as binding on Sprint as they are on TDS.
Having failed to comply with those dispute provisions—a condition for challenging a bill issued
under a tariff—Sprint is precluded as a matter of law from seeking refunds now.

Moreover, having paid its access bills with knowledge of the FCC's orders and the
provisions of TDS's tariffs, Sprint has waived any claim it might have for a refund, even if the
filed rate doctrine were held not to apply. "[A] plaintiff who voluntarily pays money in reply to
an incorrect or illegal claim of right cannot recover that payment unless he can show fraud,

coercion, or mistake of fact." *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 821 (7th Cir. 2010);

*accord, Putnam v. Time Warner Cable of Se. Wisconsin, Ltd. P'ship*, 649 N.W.2d 626, 632 (Wis.

2002) ("In Wisconsin, the voluntary payment doctrine developed as a common law principle and

has been applied in various contexts."). Sprint does not, and cannot, allege any of those exculpa-

tory circumstances.

IV.     **CONCLUSION**

        For the reasons stated herein, the TDS Companies respectfully ask this Court to dismiss

the Complaint.

Dated: October 22, 2014                          Respectfully submitted,

                                                 */s/ Russell M. Blau*

                                                 _____
                                                 Russell M. Blau
                                                 Tamar E. Finn
                                                 Bingham McCutchen LLP
                                                 2020 K Street, N.W.
                                                 Washington, DC 20006-1806
                                                 (202) 373-6035
                                                 FAX (202) 373-6001
                                                 russell.blau@bingham.com

                                                 Counsel for the TDS Companies